1
2
3
4
5
6
7
8
9      **UNITED STATES DISTRICT COURT**
10        **EASTERN DISTRICT OF CALIFORNIA**
11            **FRESNO DIVISION**
12

| | |
|---|---|
| MANUEL ARVISO,<br><br>                              Petitioner,<br><br>         vs.<br><br>MATTHEW CATE,[1]<br><br>                              Respondent. | Civil No.        1:06-1586 H (WMc)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

17

18  **I.    INTRODUCTION**

19        Manuel Arviso, a state prisoner proceeding pro se, filed a Petition for Writ of Habeas

20  Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District

21  of California challenging his Kern County Superior Court conviction in case number

22  BF105159A for murder and illegal possession of a firearm.  (Clerk's Tr. at 00404-05.)  Arviso

23  raises three claims: (1) the state court erred in allowing the admission of improper hearsay

24  testimony, (2) the prosecutor was erroneously permitted to question a defense witness about

25  prior misdemeanor misconduct and, (3) the trial court erred in admitting testimony that a

26  cigarette box

27  _____

28         [1]  The Court sua sponte substitutes Matthew Cate, Secretary of California Department of Corrections and Rehabilitation for former Secretary, Jeanne Woodford, who retired while this Petition was pending.

/ / /

linked to Arviso contained contraband and trial counsel was ineffective in referring to that contraband as "PCP" during closing argument.  (Pet. at 5-6.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, the Lodgments submitted by Respondent, Petitioner's Traverse and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Petition is **DENIED.**

## II.   **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The relevant facts as found by the state appellate court are as follows:

> On the evening of January 16, 2004, Jeannie Esquibel (Esquibel) and her sisters were at the Montecito Bar in Bakersfield.  Esquibel went outside at one point and saw Jose Castaneda (Castaneda), a former boyfriend, riding his bicycle. Castaneda stopped and he and Esquibel talked while they walked down an alley adjacent to the bar.  During their walk, Esquibel felt something stick her and asked what it was.  Castaneda took out a kitchen knife from his pants, showed it to her, and nervously said that someone was after him.  The couple walked back through the alley and stopped by Esquibel's van.

> A few minutes later, Castaneda suddenly put his arm around Esquibel's throat and positioned her in front of him as a shield.  Castaneda had nothing in his hands at that time.  Some Spanish-speaking men approached the couple but Esquibel did not understand them.  The alley was dark and she did not notice any weapons.  However, she saw one man with his hand pointed in front of him pointed at them.  She later heard a shot and assumed the man who had gestured actually had a gun in his possession.

> The apparent gunman was a Hispanic male with light complexion, prescription glasses, a beanie cap, and a dark blue or black-checked Pendleton shirt.  The man was 12 feet away and Esquibel could not really see him because she was trying to flee from Castaneda.  Both Castaneda and the man yelled in Spanish.  About five other men were right behind the latter man and they all seemed to be together.  Esquibel said the men looked like "cholos," whom she defined as tough-acting Hispanic men wearing beanie caps and Pendleton shirts.

> Esquibel's sister, Teresa, heard the yelling, ran to Esquibel, and pushed her to the ground. About three shots were discharged and Castaneda ran down the alley to dodge the bullets. The man who had extended his arm then followed Castaneda down the alley. Castaneda traveled about 22 feet and then fell to the ground on his stomach.

1

2      Esquibel did not recognize appellant as the shooter and did not see him that
evening. She initially testified she had never seen him before. Esquibel later
3   testified inconsistently that she had seen appellant at the Montecito Bar a few
times but had never spoken to him. Esquibel was unsure whether she had seen the
4   shooter's face. She said she had gotten a "fast glance" and thought the shooter
had a white face. According to Esquibel, appellant could have been the shooter
5   because he has a white complexion. However, Esquibel did not know whether
appellant's face actually resembled the shooter's face.

6

7      Bakersfield police officers arrived at the scene of the shooting at 10:30 p.m.
Castaneda was lying face down in the alley. The officers saw a large kitchen knife
next to his motionless body and two .32-caliber casings nearby. The officers also
8   saw clothing next to Castaneda. The evidence was unclear whether paramedics
had removed the clothing from Castaneda's body and the knife from the clothing.
9   Dr. Thomas L. Volk, a forensic pathologist, testified his colleague, Armand L.
Dollinger, M.D., performed an autopsy on Castaneda's body. According to Dr.
10  Dollinger's written report, a .32-caliber bullet entered the middle of Castaneda's
back and Castaneda died from massive bleeding.

11

12     Bakersfield Police Detective Pete Cavazos (Cavazos) testified that on
January 28, 2004, he overheard a telephone conversation between appellant and
13  another person. In that conversation, appellant – an ex-felon – said it was "hot"
in the area, the police had put out a reward for him, and that he was going to
14  Ensenada. Appellant also said he had gotten into an argument with a guy and had
shot him because the guy came at him with a machete. Cavazos had somewhere
between 25 and 50 contacts with appellant in the years preceding January 28,
15  2004. According to Cavazos, appellant wore prescription glasses during a
majority of their encounters.

16

17     Later on January 28, 2004, Bakersfield Police stopped appellant's niece,
Denise Velasquez (Velasquez), as she drove her Pontiac Grand Prix on Brundage
18  Avenue. The officers placed her under arrest. Appellant was a passenger in
Denise's car at the time of the detention. The police searched the Grand Prix and
19  located a floral print bag in the trunk. The bag contained a Camel cigarette box
and several items of male clothing, including a blue and black Pendleton shirt. The
cigarette box did not contain Camel cigarettes but unspecified "illegal contraband
20  in value of approximately $280."

21     On direct examination during the People's case-in-chief, Denise Velasquez
22  testified that appellant was her uncle and that she would see him once or twice
every month. In January 2004, Velasquez was driving her uncle on East Brundage
23  Lane when the police stopped her vehicle. She said a floral print bag was in her
trunk at the time of the stop and that appellant had placed the bag there when he
was dropped off at her home. Velasquez said she and her uncle had been together
24  for a few hours before the stop, which took place sometime between 2:30 and 3:00
p.m. Velasquez said they began driving around "because . . . at that time I was in
25  the process of moving and looking for a job 'cause I got laid off, so we went and
I was job searching and looking for another place."

26

27     Velasquez said she heard appellant talk about a murder outside of the
Montecito Bar on a prior occasion. She was picking up her brother on Kentucky
Avenue and appellant was present with some friends. Velasquez overheard
28  appellant say he was in "a little trouble." According to Velasquez, "[H]e
[appellant] said he got into a little trouble at this bar and that this guy came at him

with a knife or something and Manuel shot him. . . ." Although Velasquez knew about appellant's comments on the day the police stopped her vehicle, she initially denied knowing anything about the murder because she was scared. She eventually told the officers she had heard something about the murder and ultimately told them about appellant's inculpatory comments. She estimated a week had lapsed between the time she heard appellant's comments about the murder and the time the police stopped her vehicle. On further direct examination, Velasquez acknowledged that criminal charges pending against her were dropped in exchange for her truthful testimony in this case. [FN. 1]

> [Footnote 1:] In contrast to her relatively straightforward testimony on direct examination, Velasquez on cross-examination said she gave investigating officers several versions of the events leading to appellant's apprehension. She said she was scared, tearful, and worried about her three children when she was first arrested and placed in an interview room. When officers first asked her about the murder at the Montecito Bar, she said she did not know anything about it. At trial, she admitted lying to the officers because she was scared. Velasquez said she gave officers four versions of the events and they seemed to accept the fourth version. She was first questioned by one set of officers and then by another set. Each set consisted of two officers. When she offered the first version, the officers accused her of lying and mentioned her children, the seriousness of the charges, and the possibility of jail. When Officer Brown questioned her he said he was trying to decide whether to send Child Protective Services to get her children. Officer Moore told her she was going to jail because she was lying to them. When Moore asked whether she had heard appellant say something about killing someone, Velasquez told Moore she had never heard appellant say that. When Moore pressed her, Velasquez used the future tense and responded, "Well, who am I supposed to know he's gonna kill?" Officer Ramsey told Velasquez, "You're in here crying about your three kids and all the other stuff" and "we're not gonna listen to your bullshit, okay . . . we don't have the time." When Detective Chow questioned Velasquez, he specifically asked about a conversation she may have had with appellant regarding the incident at the Montecito Bar. Velasquez told Chow that appellant "just said he got in trouble there." When Chow asked for more details, Velasquez said she asked appellant what happened and appellant said "never mind." Chow questioned her further and she said, "He [appellant] said he got in a fight with some man and I don't know who was with Manuel. He didn't say who." She did not remember telling the officers that she gained this information during a direct conversation with appellant. During the extensive cross-examination, defense counsel queried whether she gained this information in a direct conversation with appellant or whether she simply overhead appellant convey this information to others. In pursuing this line of inquiry, defense counsel referred to her interview with Detective Chow, who repeatedly asked her about the murder at the Montecito Bar. During that interview, Velasquez eventually told Chow, "[H]e [appellant] said he got into a fight in the alley." When defense counsel again asked on cross-examination whether she learned this in a conversation with appellant, Velasquez said she overheard appellant "say all that."

1

2    Velasquez reaffirmed on cross-examination that someone dropped appellant off at her house on January 28, 2004, that appellant offered to assist her in looking for a new job and residence, and that he brought a floral bag to her home and placed it in the trunk of her car. She confirmed that January 28 was the only day she had seen that bag and that neither she nor her boyfriend, Ramon Garcia, ever used that floral bag.

Defense

    David Pacheco (Pacheco), a friend of appellant, picked up appellant and the latter's 20-year-old nephew, Lalo Arviso (Lalo), on the afternoon of January 16, 2004 and drove them to his home. The three friends drank some beer and then walked to the Montecito Bar a few blocks away. They wanted to drink some more and Pacheco wanted to "pick up" some women. The trio met one Tony Martinez (Martinez) at the bar. Lalo could not enter the bar because of his age and waited for the others outside the building.

    The men drank four or five beers each, left the bar, joined Lalo, and then started walking down Baker Street. When they reached the corner, they paused at a stoplight and Lalo heard two shots. The shots sounded as if they were behind them. Pacheco thought he heard a firecracker. Martinez told them to wait at the corner and he walked back to the bar to see what had happened. Martinez returned to his companions one minute later and said "let's go." Lalo did not want to linger because the police would hold everyone at the scene for a long time. They returned to Pacheco's house and socialized for a few hours. Lalo and Pacheco did not learn of the homicide until the following morning.

    In January 2004, appellant visited his niece, Cathy Salazar, in Los Angeles. He went with Velasquez, Ramon Garcia (Velasquez's then-boyfriend), and Andy (a cousin to Salazar and appellant) for the two-day visit. Before leaving for Los Angeles, Velasquez and Garcia took showers at the home of one Denise Martinez, appellant's friend. Denise saw Garcia with the floral bag that police seized on January 28, 2004. Velasquez took Garcia's shoes, pants, and shirt from the bag and ironed his clothing.

    At Salazar's house, Velasquez introduced Garcia as her boyfriend, treated him as such, and slept with him. Appellant's sister-in-law, Cathryn Arviso, saw Velasquez with a floral duffel bag and said it looked the same as the one later seized by police officers. However, Cathryn did not know whether it was the same bag. Garcia had a small black bag but it was not the bag that Detective Chow retrieved from Velasquez's closet. Salazar's nine-year-old daughter saw Velasquez and Garcia using a brownish bag with printed flowers but it was not the bag seized from Velasquez's car.

    On January 28, 2004, Denise Martinez picked appellant up at a motel and drove him to Velasquez's residence. Appellant was carrying a plastic bag filled with personal toiletries. He said he was going help Velasquez with her "house hunting." Denise saw Velasquez open her car trunk and put her purse and a bag inside. The bag was either paper or plastic. The floral bag subsequently confiscated by the police was already in the trunk at the time Velasquez opened it.

    Appellant purchased cigarettes from Bashir Khalid's liquor store for many

years.  In the two and one-half years preceding the charged offenses, appellant had only purchased Wave Lights cigarettes from Khalid.  Salazar, Cathryn, Lalo, and Denise all testified that appellant smoked Wave Lights.  Moreover, Denise and Lalo said they had seen Garcia smoke Camel cigarettes.

Salazar, Cathryn, Pacheco, and Denise said they had never seen appellant wear prescription glasses.  Bashir Khalid, who saw appellant almost every day, had never seen appellant wear prescription glasses.

(Lodgment No. 5 at 3-8.)

## III.    **PROCEDURAL BACKGROUND**

On March 26, 2004, the Kern County District Attorney filed a First Amended Information charging Arviso with two counts:  the murder of Jose Castaneda (Cal. Penal Code § 187(a)) with personal use of a firearm causing death (Cal. Penal Code § 12022.53(d)) (count one); and possession of a firearm by an ex-felon (Cal. Penal Code § 12021(a)(1)) (count two).  (Clerk's Tr. at 00220-21.)  In the Amended Information, it was also alleged that Arviso had three prior serious felony convictions (Cal. Penal Code § 667(a)); three prior "strike" convictions (Cal. Penal Code §§ 667(c) – (j), 1170.12) and four prior convictions for which he had served a prison term (Cal. Penal Code § 667.5(b)).  (Clerk's Tr. at 00221-28.)

On September 15, 2004, a jury found Arviso guilty on both counts.  (Clerk's Tr. at 00363-67.)  The trial court subsequently found two of the prior serious felony conviction allegations, two of the prior strike conviction allegations, and all of the prior prison term allegations to be true.  (Clerk's Tr. at 00368–00369.)  Arviso was sentenced to 100 years to life in prison plus 12 years.  (*Id.* at 00404-05; Rep. Tr. at 00811-13.)

Arviso appealed his conviction to the California Court of Appeal for the Fifth Appellate District, which affirmed his conviction in an unpublished opinion filed January 24, 2006.  (Lodgment Nos. 2, 5.)  Arviso then filed a Petition for Review in the California Supreme Court.  (Lodgment No. 7.)  The California Supreme Court denied the petition without comment on May 10, 2006.  (Lodgment No. 8.)

Arviso then filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Central District of California on October 26, 2006.  (Doc. No 1.)  The case was transferred to the United States District Court for the Eastern District of

6                                              06cv1586

California on November 11, 1006. (*Id.*) Respondent filed an Answer on April 13, 2007, and

Arviso filed a Traverse on April 28, 2008. (Doc. Nos. 24, 29.) The matter was transferred to

this Court on November 25, 2008. (Doc. No. 30.)

**IV.    DISCUSSION**

    **A.    Scope of Review**

      Title 28, United States Code, § 2254(a), sets forth the following scope of review for

federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (2006) (emphasis added). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

      "[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential

standard for evaluating state-court rulings, which demands that state-court decisions be given

the benefit of the doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting

*Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). Because Arviso's claims were adjudicated on the

merits in state court, to obtain federal habeas relief, he must satisfy either § 2254(d)(1) or

§ 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets

§ 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has

/ / /

> on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

## B.   Analysis

Arviso raises four grounds for relief in his Petition, grouping them into three claims:  (1) the trial court improperly permitted hearsay evidence to be admitted at trial; (2) the trial court permitted the prosecutor to ask improper questions of a "key defense witness"; and (3) the trial court erred in admitting testimony that a cigarette case contained contraband and trial counsel was ineffective for referring to this contraband as PCP during his closing argument. (Pet. at 5-6.)

As to claim one, Respondent argues Arviso has not alleged the violation of a federal constitutional right and has thus failed to state a cognizable claim on federal habeas review. Moreover, Respondent argues claim one must be dismissed because Arviso failed to present it to the California Supreme Court. (Mem. P. & A. Supp. Answer at 15-16.)   Furthermore, Respondent argues, even assuming the claim is cognizable, it fails on the merits.  (*Id.*)  As to claims two and three, Respondent argues the state court's denial of the claims was neither

8

contrary to, nor an unreasonable application of, clearly established federal law. (*Id.* at 7-10, 12-14.)

### 1.   *Hearsay*

Arviso claims he was found guilty based on improper and inadmissible hearsay evidence. (Pet. at 5A.)   Specifically, Arviso contends the trial court erroneously permitted witnesses Denise Velasquez and Detective Cavazos to testify that he overheard defendant making incriminating statements regarding the murder. (*Id.* at 5.)   Respondent makes three arguments: (1) the claim must be dismissed because it is unexhausted; (2) the claim is not cognizable on federal habeas corpus review; and (3) the claim fails on the merits. (Mem. of P. & A. Supp. Answer at 14-18.)

Respondent is correct that Arviso has failed to exhaust state judicial remedies as to this claim. To satisfy the exhaustion requirement, a petitioner must "fairly present[] his federal claim to the highest state court with jurisdiction to consider it . . . or . . . demonstrate[] that no state remedy remains available." 28 U.S.C. §2254(b), (c); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982)); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987). The petitioner must have raised the very same federal claims brought in the federal petition before the state supreme court. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).   This Court has carefully reviewed the state records and it is clear this claim was never presented to the state courts.   Moreover, in his Traverse, Arviso admits he never presented this claim to the California Supreme Court.   (*See* Traverse at 1-2.)   The claim is therefore unexhausted.

Applications for writs of habeas corpus that contain unexhausted claims generally must be dismissed. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982).   This Court may deny the petition on the merits, however, "where it is perfectly clear that that the applicant does not raise even a colorable federal claim." *See* 28 U.S.C. §2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

To present a cognizable federal habeas corpus claim under § 2254, a state prisoner must allege both that he is in custody pursuant to a "judgment of a State court," and that he is in

custody in "violation of the Constitution or laws or treaties of the United States."  28 U.S.C.
§2254(a). "In conducting habeas review, a federal court is limited to deciding whether a
conviction violated the Constitution, laws or treaties of the United States." *Estelle v. McGuire*,
502 U.S. 62, 68 (1991).  As Respondent correctly notes, federal habeas relief is not available for
an alleged error in the interpretation or the application of state law.  *See* 28 U.S.C. § 2254(a);
*Estelle*, 502 U.S. 62, 67-68 (1991).

In this case, Arviso fails to allege that the admission of the purported hearsay testimony
violated his federal constitutional rights.  Rather, he merely states the alleged error violated his
rights under the "Hearsay Rule." (Pet. at 5.)  He in no way alleges a violation of his rights under
the federal Constitution.  A state's interpretation of its laws or rules provides no basis for federal
habeas corpus relief because no federal constitutional question arises.  *Estelle*, 502 U.S. at 68
(1991) (federal habeas corpus relief does not lie for errors of state law, and federal courts may
not reexamine state court determinations on state law issues).  Accordingly, this claim is not
cognizable on federal habeas review.

Moreover, even if this Court were to conduct a Sixth Amendment analysis of the claim,
it would fail.  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court revised the
test for determining the admissibility of hearsay statements.  The Court held that, with respect
to the admission of out-of-court testimonial statements against the accused, "the Sixth
Amendment demands what the common law required: unavailability [of the hearsay declarant]
and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68.  "A critical portion
of [the *Crawford* ] holding . . . is the phrase 'testimonial statements.'  Only statements of this sort
cause the declarant to be a 'witness' within the meaning of the Confrontation Clause.  It is the
testimonial character of the statement that separates it from other hearsay that, while subject to
traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis
v. Washington*, 547 U.S. 813, 821 (2006) (internal citation omitted).

Both statements Arviso complains of were "off-hand, overheard remark[s]" and therefore,
not testimonial.  *See Crawford*, 541 U.S. at 51.  Denise Velasquez, Arviso's niece, testified she
"overheard" Arviso telling some friends that he had "gotten into a little trouble at this bar and

that this guy came at [Arviso] with a knife or something and [Arviso] shot him. . ." (Rep. Tr. at 00228.)   Although the circumstances are unclear, Detective Cavazos testified that he overheard a telephone conversation in which Arviso stated that it was "hot" in the area, the police had put out a reward for him, and he was going to Ensenada, Mexico. (Rep. Tr. at 00398, 00401-04.)  Cavazos testified he also heard Arviso say he had gotten into an argument with a guy and shot him because the guy "came at [Arviso] with a machete."  (Rep. Tr. at 00404-05.)  Arviso's statements were not "formal statement[s]" to a government officer. *See Crawford*, 541 U.S. at 50-51.  Indeed, Cavazos overheard the statement unbeknownst to Arviso. (*See* Rep. Tr. at 00398.)  Therefore, because the statements were non-testimonial, the Sixth Amendment's requirements for admissibility do not come into play.  Any error with regard to the admission of Velasquez's or Cavazos' testimony is a violation of only state law, which is not cognizable on federal habeas.  Arviso's Sixth Amendment right was not violated.  *Crawford*, 541 U.S. at 68.

Based on the foregoing, "it is perfectly clear that [Arviso] does not raise even a colorable federal claim." *Cassett*, 406 F.3d at 623-24.  Accordingly, although this claim is not exhausted, the Court can deny it under 28 U.S.C. § 2254(b)(2).  *See id.*  Arviso is not entitled to relief as to this claim.  *See* 28 U.S.C. § 2254(d); *Williams*, 429 U.S. at 412-13.

### 2.   Impeachment of Denise Martinez

In his second claim, Arviso argues that the trial court erred when it permitted the prosecutor to impeach a defense witness by questioning her about a prior arrest for giving false information to a law enforcement officer. (Pet. at 5.) Arviso also raised the claim in his petition for review to the California Supreme Court, and it was denied without comment or citation. (*See* Lodgment Nos. 7, 8.)  Accordingly, this Court must "look through" to the decision of the California appellate court's opinion as the basis for its analysis. *Ylst*, 501 U.S. 797, 801-06.  In denying the claim, the court of appeal stated:

> The following exchange occurred outside the presence of the jury on the afternoon of September 13, 2004:
>
> [MR. SPIELMAN [deputy district attorney]]: . . . Denise Martinez was a person I found out about late.

MR. COKER [deputy public defender]: Uh-huh.

MR. SPIELMAN: It appears in 1992 she had an arrest for a 148.9, Vehicle Code 31, which is essentially the same thing. She was never arraigned on that and it ended up going inactive three years later. [¶] She does have a '96 conviction for 476a, misdemeanor insufficient funds.

THE COURT: But she doesn't have a viable outstanding warrant at this time?

MR. SPIELMAN: No. They inactivated it due to age.

THE COURT: Okay.

MR. SPIELMAN: She has in 2000 a 14601 and an archived misdemeanor from '89 and '98. [¶] I would simply ask-because I found out about her late. I put in a request. I haven't gotten it. [¶] If I would be able to inquire of her if she was ever arrested in 1992 for giving a false name.

MR. COKER: Well, your Honor, I would object to that because that's 12 years ago and it's a misdemeanor. It's a very minor crime.

THE COURT: The date again.

MR. SPIELMAN: 1992.

THE COURT: That would be 12 years ago.

MR. COKER: For a misdemeanor on giving a false name.

THE COURT: I have a concern about the age on that.

MR. SPIELMAN: Well, when you consider that . . . in 1996 she has a misdemeanor insufficient funds plea. In 2000 she has a 14601.

MR. COKER: Well, 14601 isn't moral turpitude. It's driving on a suspended license.

MR. SPIELMAN: And she has archived misdemeanors from - well, there's one in 1989. That predates it. [¶] And then in 1998 an archived misdemeanor. I just don't know what the disposition was.

MR. COKER: I have no idea, your Honor, what it is either.

THE COURT: So she has in '92 a giving false information to a peace officer, and then what's the other offense?

MR. SPIELMAN: In 1996 she has an insufficient funds plea, Penal Code Section 476a(a). [¶] And then in 1998 she has an archived misdemeanor. I do not know what that was for. [¶] And then in

2000 a plea to a Vehicle Code Section 14601 misdemeanor.

THE COURT:  I don't think the last two, the archive or the 14601, are crimes involving moral turpitude.

MR. SPIELMAN:  And I'm not asking to get them in as moral turpitude.  It's just simply that it goes towards showing that there isn't a significant amount of time where she's had a-

THE COURT:  The fact that there's an insufficient funds [case] in '96 I think gives greater time reference to the '92 false information to a peace officer.   [¶] That's a misdemeanor, correct.

MR. SPIELMAN:  Yes.

THE COURT:  And the '96 insufficient funds is – again, we're talking misdemeanor, conduct amounting to a misdemeanor.  How are you going to establish that?

MR. SPIELMAN:  Well, if she testifies I'd be asking her isn't it true that in 1992 you gave false information to a police officer.

THE COURT:  Suppose she says no.

MR. SPIELMAN:  Well, I have information that she was arrested for it, so I'm not asking in bad faith.

MR. COKER:  Does she have a conviction you say?

MR. SPIELMAN:  No, it came up as a complaint filed, but-

MR. COKER:  Well, your Honor, I'm going to argue if it's not a conviction, he shouldn't be able to ask that, then.

THE COURT:  Traditionally the way in which they handle these that I've seen is that the prosecutor brings in a witness.   [¶] . . . [¶]

MR. COKER: I do believe, your Honor, they bring in third parties.

MR. SPIELMAN:  That's one way of doing it.  If they testify, I have a witness to that, the facts of that case, and that would be her [meaning, Denise Martinez herself].   [¶] The problem is that I only learned of this person I think last week or the week before.   [¶] . . . [¶]

MR. COKER:  But running a rap, your Honor, doesn't take that long.  Of course, trying to find a witness might take longer.   [¶] I'm just going to ask the Court [to make] a ruling that that is just too remote and not to let it in.  It's a misdemeanor and it's not even a conviction. . . .

THE COURT:   Those aren't - it's not to be admitted as a conviction.  It's conduct amounting to a misdemeanor and I believe that's-

MR. SPIELMAN: [Evidence Code section] 788.   [¶] . . . [¶]

06cv1586

THE COURT: I'm going to find that it is not remote in time and that the probative value would outweigh the prejudicial impact. It's not a conviction that we want. It's just conduct amounting to a misdemeanor. [¶] . . . [¶] . . . It is one of the circumstances that you may consider in weighing the testimony of that witness. [¶] If she admits that, fine. If not, we should have a conversation at sidebar as to how you will proceed from there."

During the defense case, the following exchange occurred on cross-examination of Denise Martinez:

[By Mr. Spielman] Q. Now, about 12 years ago was there a time that you told the police-you gave them a fake name in 1992?

[By Ms. Martinez] A. Um, could have. I'm not too sure.

Q. Well, why would you give a fake name?

A. I don't - I don't know what you're talking about.

Q. In 1992 weren't you arrested for giving false information to a police officer, giving a fake name?

A. Not that I can remember.

Q. Well, wouldn't you remember something like that?

A. Yeah, I'm pretty sure that I would.

Q. Well, then, shouldn't your answer be-

A. Yeah.

Q. -that you did not?

A. Yeah, I don't remember ever getting arrested in 1992.

Q. So your testimony is that you were not arrested in 1992 for giving fake-false information to a police officer.

A. No. [Footnote 2 omitted].

"Moral turpitude" is defined as the "'general readiness to do evil.'" (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091, 125 Cal.Rptr.2d 896.) In *People v. Wheeler* (1992) 4 Cal.4th 284, 292, 14 Cal.Rptr.2d 418, 841 P.2d 938 (*Wheeler*), our Supreme Court concluded that Proposition 8, the "Truth-in-Evidence" amendment to the California Constitution (Cal. Const., art. I, § 28, subd. (d)) gave courts broad discretion to admit or exclude acts of dishonesty or moral turpitude. (*Wheeler*, supra, 4 Cal.4th at pp. 287-288, 14 Cal.Rptr.2d 418, 841 P.2d 938.) Accordingly, misdemeanor misconduct involving moral turpitude was held admissible for impeachment purposes. A misdemeanor conviction itself is not admissible under Evidence Code section 788, but proof of misdemeanor misconduct amounting to "moral turpitude" is admissible. [Foonote 3 omitted]. (*Wheeler*, supra, at pp. 290, 292, 295, 300, 14 Cal.Rptr.2d 418, 841 P.2d 938.)

1

2   ///

3          The admissibility of such misdemeanor misconduct for impeachment is
subject to the trial court's exercise of discretion under Evidence Code section 352.
4   (*Wheeler*, supra, 4 Cal.4th at pp. 295-296, 14 Cal.Rptr.2d 418, 841 P.2d 938.)
We review the trial court's ruling for abuse of discretion.   (*People v. Green*
5   (1995) 34 Cal.App.4th 165, 182-183, 40 Cal.Rptr.2d 239.)   A court's exercise of
discretion in determining relevance under Evidence Code section 352 will be upset
6   only if there is a clear showing of an abuse of discretion.   When the question on
appeal is whether the trial court abused its discretion, it is insufficient to present
7   facts which merely afford an opportunity for a difference of opinion.   Rather, we
conclude a trial court has abused its discretion only if the court exceeded the
8   bounds of reason. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65-66, 215
Cal.Rptr. 716 (*Stewart*).)

9
          The *Wheeler* court emphasized that the underlying conduct of the witness
10   should be used for impeachment.   Thus, a witness could admit the conduct or
other witnesses could be called to describe the conduct.   Where a witness denies
11   having committed a misdemeanor involving moral turpitude, he or she may only
be impeached by evidence of the underlying conduct of that misdemeanor.
12   (*People v. Steele* (2000) 83 Cal.App.4th 212, 222-223, 99 Cal.Rptr.2d 458.)
Under California law, it is improper for a prosecutor to ask questions of a witness
13   that suggest facts harmful to a defendant, absent a good faith belief that such facts
exist.   (*People v. Warren* (1988) 45 Cal.3d 471, 480-481, 247 Cal.Rptr. 172, 754
14   P.2d 218.)

15          In the instant case, the prosecutor advised the court his office had filed a
criminal complaint against Denise Martinez in 1992 for allegedly giving false
16   information to a police officer.   The prosecutor further informed the court, "I have
information that she was arrested for it, so I'm not asking in bad faith." The court
17   ultimately concluded the conduct was not too remote in time and the probative
value   of   the   evidence   would   outweigh   any   prejudicial   impact.    On
18   cross-examination, the prosecutor asked Denise Martinez a series of seven
questions about her alleged provision of false information to a police officer in
19   1992.   Her answers fell into three categories: (1) she did not remember giving
false information; (2) she did not know what the prosecutor was talking about; and
20   (3) she did not remember being arrested for giving false information in 1992.

21          On appeal, appellant insists "Denise was taken aback by the prosecutor's
efforts to impeach her. . ."   However, a careful reading of the record reveals
22   Martinez disarmed the prosecutor by her frank responses and defused any possible
insinuation or "sting" from his probing questions.   Rather than being taken aback
23   by the questions on cross-examination, Martinez parried the prosecutor's
questions with her forthright denials and left him with little or nothing to show for
24   his interrogatory efforts.   In sum, the prosecutor had a good faith basis in a
criminal complaint for inquiring into Martinez's misdemeanor conduct in 1992.
25   He asked her a series of questions on cross-examination and she responded by
denying any arrest for giving false information to a police officer in 1992.   He
26   offered no evidence to dispute her responses.

27          In light of all of the facts and circumstances, we cannot say the trial court
abused its discretion or exceeded the bounds of reason by allowing the prosecutor
28   to make the inquiry. [Footnote 4].   Although appellant mounts a vigorous
argument to show "[t]he prosecutor's questioning left a serious taint on Denise's

credibility," it is insufficient to present facts which merely afford an opportunity for a difference of opinion. (*Stewart*, supra, 171 Cal.App.3d at pp. 65-66, 215 Cal.Rptr. 716.) His contention must be rejected.

> [Footnote 4:] Appellant alternatively argues his counsel was ineffective by failing to cite the Fourteenth Amendment right to due process and a fair trial in opposing the prosecutor's attempts to impeach defense witness Martinez. The United States Supreme Court has held the Truth-in-Evidence provision of the California Constitution (Cal. Const., art. I, § 28, subd. (d)) does not violate the Due Process Clause of the Fourteenth Amendment. (*California v. Greenwood* (1988) 486 U.S. 35, 44, 108 S.Ct. 1625, 100 L.Ed.2d 30 (*Greenwood*).) The California Supreme Court, in turn, has held the Truth-in-Evidence provision requires the admission in criminal cases of all relevant proffered evidence unless exclusion is allowed or required by an existing statutory rule of evidence relating to privilege or hearsay or Evidence Code sections 352, 782, or 1103. The limitations on impeachment evidence set forth in Evidence Code sections 787 and 788 no longer preclude the introduction of relevant misdemeanor misconduct for impeachment in criminal proceedings. (*Wheeler*, supra, 4 Cal.4th at pp. 291-292, 14 Cal.Rptr.2d 418, 841 P.2d 938.) Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile. (*People v. Price* (1991) 1 Cal.4th 324, 386-387, 3 Cal.Rptr.2d 106, 821 P.2d 610; *People v. Anderson* (2001) 25 Cal.4th 543, 587, 106 Cal.Rptr.2d 575, 22 P.3d 347.) Trial counsel's assertion of an objection based on the Due Process Clause of the Fourteenth Amendment would have been futile in light of the holdings in *Greenwood* and *Wheeler* and counsel's failure to interpose an objection on such ground did not amount to ineffective assistance.

(Lodgement No. 5 at 8-15.)

State evidentiary rulings are not cognizable in a federal habeas proceeding, unless the admission of the evidence violated the petitioner's due process right to a fair trial. *Estelle*, 502 U.S. at 70; *Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990). To establish a due process violation, a petitioner must show that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991); *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1466 (9th Cir. 1986). On federal habeas review, the Court does not determine whether the evidence might have been more prejudicial than probative and thus inadmissible under California law. *See McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993). Rather, the Court is "only concerned with its relevance." *Id.*

As noted by the appellate court, under California law, evidence of prior misdemeanor

1   misconduct involving moral turpitude is admissible at trial, provided the probative value

2   outweighs the prejudice.  *See People v. Wheeler*, 4 Cal.4th 284, 292 (1992); *see also* Cal. Evid.

3   Code § 352.  A witness may be asked questions regarding such misdemeanor misconduct so long

4   as the prosecutor has a good faith belief that such conduct occurred.  *People v. Warren*, 45

5   Cal.3d 471, 480-81 (1988).

6        Here, as state court concluded, the prosecutor had information that a complaint was filed

7   against Martinez for providing false information law enforcement.  By questioning Martinez

8   regarding her alleged prior misdemeanor misconduct, the prosecutor sought to elicit relevant and

9   probative impeachment evidence – namely that Martinez had been untruthful to law enforcement

10  in the past and therefore her credibility as a witness could be called into question.  If Martinez

11  had admitted to previously giving false information to law enforcement it could have adversely

12  affected her credibility as a witness.  The evidence, therefore, was relevant to Martinez's

13  credibility.  *See McKinney*, 993 F.2d at 1384.  The prosecutor's questions were proper under

14  state law and did not violate Arviso's due process rights.  *See id.*  Moreover, even assuming the

15  questions were prejudicial, they did little harm because Martinez denied having been charged

16  with such misconduct.  (Rep. Tr. at 00540.)  The prosecutor asked only a few brief questions

17  regarding the alleged misconduct and when Martinez denied it, he moved on to other

18  questioning.  Given the whole of Martinez's testimony, this very brief exchange was far from

19  "creat[ing] an absence of fundamental fairness that 'fatally infected the trial.'"  *See*

20  *Kealohapauole*, 800 F.2d 1463, 1465 (9th Cir.1986).

21       Accordingly, the state court's denial of this claim was neither contrary to, nor an

22  unreasonable application of, clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*, 429

23  U.S. at 412-13.  Arviso is not entitled to relief as to this claim.

24            *3.     Evidence and Comment Concerning Contraband*

25       In his final claim, Arviso contends his right to a fair trial was violated when the trial court

26  permitted the admission of evidence and testimony that a cigarette box, alleged to have belonged

27  to Arviso, contained contraband.  Arviso further argues that defense counsel rendered ineffective

28  assistance when he referred to the alleged contraband as "PCP" during closing argument.  (Pet.

1   at 6.)  Respondent argues the state court's denial of both claims was neither contrary to, nor an

2   / / /

3   unreasonable application of, clearly established law.   This court will address Arviso's

4   evidentiary claim and ineffective assistance of counsel claims separately.

5                                    a.  Evidentiary Claim

6          This Court must look to the state appellate court's opinion as the basis for its analysis.

7   *Ylst* 501 U.S. 801-06.     Because the appellate court's opinion contains such a thorough

8   discussion of both the facts and legal analysis, this Court quotes it, virtually, in full:

9          A.    Chronology of Events

10              Before the start of trial, the court granted appellant's motion to sever the
    drug charges of January 28, 2004 from the murder charge. Appellant requested
11   that no mention be made of the drugs found on him on January 28, 2004, to avoid
    a spillover effect. Police found heroin on Velasquez and 14 PCP cigarettes in a
12   box of Camel cigarettes in the floral bag. There was no identification in the bag.
    The court ruled the drug evidence was irrelevant. The prosecutor asked that the
13   floral bag be admitted into evidence, because Velasquez said it was appellant's
    bag, which substantiated appellant's statement that he needed to get out of town
14   and showed flight, and because there was a Pendleton shirt inside that generally
    matched the description of the shirt worn by the shooter. The prosecutor was not
15   opposed to excluding evidence of the cigarette box and the PCP cigarettes.
    Appellant's counsel stated he would produce witnesses to show the bag belonged
16   to someone else.

17              Before the start of testimony, counsel stated that he wanted to elicit that the
    cigarette box in the floral bag was a Camel box because Velasquez's boyfriend
18   Garcia, but not appellant, smoked Camel cigarettes. The prosecutor then argued
    for admission of evidence that the Camel box contained PCP cigarettes. Counsel
19   proposed instead that the jury be told there were no cigarettes in the Camel box.
    Counsel argued that the cigarette brand was significant, that Velasquez and Garcia
20   had been seen with the floral bag, and it was reasonable to infer that the owner of
    the bag probably smoked Camel cigarettes, and appellant did not. The prosecutor
21   argued it would be misleading to tell the jury there were no cigarettes in the
    cigarette box. The court did not like revealing there were drugs in the box because
22   there had been no voir dire regarding drugs. The prosecutor argued that the jury
    would infer that the person who smoked the cigarettes left the empty box in the
23   bag, so it must be Garcia's bag. Counsel argued that it is logical to infer that if
    someone hides PCP cigarettes in a cigarette box, the person will use an empty box
24   of theirs. The court proposed that the jury be told there was something in the box
    not relevant to this case, and counsel said that would be fine. The court expressed
25   fear that if PCP or drugs were mentioned, jurors whose lives might have been
    affected by drugs would be prejudiced against appellant. The prosecutor then
26   argued that because the PCP cigarettes had value, the owner would not part with
    them readily and would be unlikely to put them into a container identifiable to him
27   or her.

28              Counsel maintained that the Camel brand was relevant to the identity of the

                                    18                                    06cv1586

owner of the duffel bag, but admitting evidence of the drugs would be unduly prejudicial. The court agreed, but decided a limiting instruction would be effective. Counsel objected under the Fourteenth Amendment that this would deny appellant a fair trial and argued that that the cigarette box's contents were not relevant to show ownership of the box and that evidence of the contents should be excluded under Evidence Code section 352.

The court overruled appellant's objections and held the jury would be told the box contained contraband valued at approximately $280, but the nature of the box's contents could not be considered for any reason other than to show ownership of the box.

At trial, defense counsel elicited that there was a Camel cigarette box inside the floral bag seized from Velasquez's car on January 28, 2004. Pursuant to the court's earlier ruling, the parties stipulated:

> It is stipulated between the parties that the Camels box found in the floral pattern bag did not contain Camels cigarettes, but it did contain illegal contraband in value of approximately $280. The nature of the box may not be considered by the jury for any reason other than to show the identity of ownership of the box.

. . .

B.  Admission of Evidence of Contraband in the Cigarette Box

. . .

The record in the instant case reveals the court engaged in a lengthy discussion with counsel regarding the contents of the Camel cigarette box and the relevance of such evidence. In fact, the colloquy between court and counsel encompassed more than 60 pages of the reporter's transcript on appeal. The court carefully drew out the facts underlying this evidence, explored the parties' respective positions as to relevance and admissibility, expressed concern about gratuitous references to "PCP or drugs," and ultimately observed:

> In order not to misrepresent, I see the relevancy, the foundation that you've [the prosecution] established, and in order that the probative value is not outweighed by the prejudicial . . . effect of saying the PCP cigarettes-you can put a cautionary instruction that it contains suspected controlled substances of a value [¶] . . . [¶] of $280.

Counsel discussed the matter further and the court interposed:

> So that's why I feel a cautionary instruction is needed and I'll let you-if you can think of a more succinct and point of meaning to refine down what I think the gist of the cautionary instruction should be, that the nature of the contents of the box is solely relevant for the limited purpose of your determination as to the ownership of the box.

After even further discussion with counsel, the court observed:

> Any suggestion on a limiting instruction, Mr. Spielman [deputy district attorney], from your perspective?

19

06cv1586

> And I'm suggesting that you give me one now because I want to
> make sure that we recognize your relevancy of the contents of the
> box, but that shouldn't be to inflame the jury on an issue that's
> really not before them; that is, possession of a controlled substance,
> which is [to be tried separately in] the second trial."

The prosecutor responded by suggesting language for a stipulation and limiting instruction. The court, in turn, suggested the following phrasing:

> The nature of the contents of the box) [i]s not relevant and may not
> be considered by you for any purpose other than the issue of the
> ownership of the box. [¶]  And that, in essence, says they can't use
> that as relevant evidence as to the murder charge in Count 1 or the
> ex-felon in possession charge in Count 2.

The foregoing exchanges demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352. (*Jennings*, supra, 81 Cal.App.4th at pp. 1314-1315, 97 Cal.Rptr.2d 727.)  In other words, the trial court's painstaking handling of the matter was deliberate, thoughtful, and meticulous and did not reflect an arbitrary determination, capricious disposition, or whimsical thinking. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658, 14 Cal.Rptr.3d 534.)  The court was keenly aware of potential prejudice arising from the nature of the contraband and weighed that factor against the probative value of the evidence during the lengthy exchange with counsel for the respective parties.  The trial court's determination of the matter did not constitute an abuse of discretion.

The court's reasoned exercise of its discretion is clearly reflected in the stipulation of the parties and the related limiting instruction.  Where trial is by jury, all questions of fact are to be decided by the jury except where otherwise provided by law.  Subject to the control of the court, the jury is to determine the effect and value of the evidence addressed to it, including the credibility of witnesses and hearsay declarants. (Evid.Code, § 312.)  The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trier of fact and its findings of fact, express or implied, must be upheld if supported by substantial evidence.  (*In re Carpenter* (1995) 9 Cal.4th 634, 646, 38 Cal.Rptr.2d 665, 889 P.2d 985.)

The court's instructions are determinative in their statement of law. (*People v. Sanchez* (1995) 12 Cal.4th 1, 70, 47 Cal.Rptr.2d 843, 906 P.2d 1129.)  Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions. (*People v. Tatman* (1993) 20 Cal.App.4th 1, 11, 24 Cal.Rptr.2d 480.)  Expressed another way, jurors are required to determine the facts and render a verdict in accordance with the court's instructions on the law.  Even if a jury does not expressly agree to perform a duty, we must presume that an official duty has been performed.  Specifically, we presume that the jury meticulously followed the instructions given. (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73, 113 Cal.Rptr.2d 86.)

The trial court did not abuse its discretion in allowing the prosecution to refer to "contraband" in its stipulation with appellant or in giving an instruction to limit the jury's use of that evidence to determine the identity of ownership of the floral bag.

(Resp't Lodgment No. 5 at 15-23.)

///

As discussed above, state evidentiary rulings are cognizable in a federal habeas proceeding *only* if the admission of the evidence violated the petitioner's due process right to a fair trial. *Estelle*, 502 U.S. at 70; *Gordon*, 895 F.2d at 613. Thus, Arviso must show that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *See Ortiz-Sandoval*, 81 F.3d at 897. On federal habeas review, the Court considers whether the evidence was relevant, not whether the evidence might have been more prejudicial than probative and thus inadmissible under California law. *See McKinney*, 993 F.2d at 1384. Any possibility of prejudice to petitioner may be mitigated by the trial court's limiting instructions. *See Estelle*, 502 U.S. at 75; *Gordon*, 895 F.2d at 613.

A floral bag was found in Velasquez's car and Velasquez testified that Arviso had left the bag in her trunk. Among other things, the bag contained the Camel cigarette box and several items of male clothing, including a "Pendleton" shirt similar to that worn by the assailant. It was the prosecution's theory that the bag was Arviso's and it was evidence that he intended to flee. This was consistent with the testimony of Detective Cavazos, who overheard Arviso on the telephone, stating that he was "hot" in the area and he was going to Ensenada, Mexico. Velasquez testified the bag was Arviso's and he had put it in the trunk of her car on the day that she was stopped by police. (Rep. Tr. at 00225-26.)

The defense sought to introduce the Camel cigarette box to show that the bag belonged to Garcia or Velasquez. The defense presented evidence that Garcia, Velasquez's boyfriend, smoked Camel cigarettes and Arviso smoked a different brand. (*See* Rep. Tr. at 00272, 00484, 00492, 00513.) By tying Garcia and/or Velasquez to the floral bag with the cigarettes, the defense sought to show that one of the key pieces – the Pendleton shirt – of evidence did not belong to Arviso. On the other hand, the prosecution argued that because the Camel cigarette box did not contain cigarettes, but rather contraband worth approximately $280, it was less easily tied to a smoker of that brand.

1    It was relevant that a Camel cigarette box was found in the bag because it could connect

2    the box to smoker of that brand (Garcia).  However, it was also relevant that the box did not

3    contain cigarettes.   Failure to inform the jury of this fact would have been misleading.

4    Moreover, it was also relevant that, instead of tobacco cigarettes, the box contained $280 worth

5    of contraband.  Because of the value of the box's contents, it would be less likely that the owner

6    would let it out of his or her control for an extended period of time – thus, tending to show that

7    the box did not belong to Garcia.  (*See* Rep. Tr. at 00083-00102.)

8    The content of the cigarette box, and its value, could be seen by a trier of fact to make the

9    defense's proposition that the bag belonged to Garcia, less probable.  Thus, the evidence was

10   relevant.  *See McKinney*, 993 F.2d at 1384.  Moreover, the trial court instructed the jury to

11   consider the evidence for the sole purpose of determining ownership of the floral bag.

12   Accordingly, any prejudice to Arviso was mitigated by the limiting instruction provided to the

13   jury. *See Estelle*, 502 U.S. at 75; *Gordon*, 895 F.2d at 613.  The state court's denial of this claim

14   was neither contrary to, nor an unreasonable application of clearly established law.  *See* 28

15   U.S.C. § 2254(d); *Williams*, 429 U.S. at 412-13.  Arviso is not entitled to relief as to this claim.

16                    b.    Ineffective Assistance of Counsel Claim

17   Finally, as part of his third claim, Arviso argues his defense counsel was ineffective when

18   he referred to the contraband found in the cigarette box as "PCP" during closing argument.  (Pet.

19   at 6.)   The appellate court denied the claim, stating:

20   During closing argument, defense counsel stated:

21        So Denise Velasquez did not want you jurors to know that she had
         that bag in her possession, probably because she thought that that
22        bag and this bag-she wasn't sure which one had the PCP in it. [¶]
         Who connects this bag directly to –

23
         The prosecutor immediately requested and the court granted a sidebar
24        conference. As set forth ante, when the proceedings resumed, defense counsel
         placed the following on the record:
25
         Ladies and gentlemen, there was a stipulation that mentioned
26        contraband, and if I said anything other than contraband, I
         misspoke. I assure you it was unintentional.
27
         But the only word I will use and the only intention I mean to give
28        when I'm referring to anything that was in this bag is the word
         "contraband" and nothing else.

                                         22                            06cv1586

> If you got any other meaning than the word "contraband" from me, please in fairness to both sides of this case, disregard that and stay in you deliberations and in your thoughts only with the word"contraband."  Please do that.

The court immediately admonished the jury:

> And ladies and gentlemen, as counsel indicated, please give that earlier statement no weight or regard whatsoever or at all or the word "contraband."  That is not to in any way affect your verdict.

> Both sides agree that defense counsel erred by referring to PCP in his closing argument.  The question is whether the error was prejudicial.  As noted above, the prejudice component of ineffective assistance focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.  (*Lockhart v. Fretwell*, supra, 506 U.S. at p. 372.)  Once again, the error was brief, defense counsel immediately acknowledged the error and offered a corrective statement to the jury, the court admonished the jury to disregard the term that counsel used, and the error was not repeated.  Further, during the People's case-in-chief Detective Cavazos reviewed his career as a police officer and indicated he was currently assigned as a detective to the narcotics unit.  Detective Cavazos also testified he had between 25 and 50 contacts with appellant, although he did not expressly say they were narcotics-related.  Both Detective Cavazos and appellant's niece, Denise Velasquez, testified they overheard appellant admit his complicity in the shooting of a man who had a knife.  Law enforcement officers found a knife near the body of the victim, Jose Castaneda.  Velasquez specifically heard appellant say that he shot a man outside the Montecito Bar.  Appellant's companions admitted they were with him outside the Montecito Bar at the time of the killing.  However, they claimed they were all together when the shots rang out.

> In view of these compelling facts and circumstances, we cannot say defense counsel's solitary reference to the acronym "PCP" so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  (*In re Visciotti*, supra, 14 Cal.4th at p. 352, 58 Cal.Rptr.2d 801, 926 P.2d 987.)   [Footnote 5 omitted].

(Lodgment No. 5 at 25-27.)

To establish ineffective assistance of counsel, Arviso must first show that his trial counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  Judicial scrutiny of counsel's performance must be "highly deferential."  *Id.* at 689.

////

Second, he must show counsel's deficient performance prejudiced the defense.  *Id.* at 687.

1    This requires a showing that counsel's errors were so serious they deprived Arviso "of a fair

2    trial, a trial whose result is reliable."  *Id.*  To satisfy the prejudice prong, Arviso must

3    demonstrate a reasonable probability that the result of the proceeding would have been different

4    absent the error.  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine

5    confidence in the outcome."  *Id.*  The prejudice inquiry is to be considered in light of the strength

6    of the prosecution's case.  *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir.), *amended*, 311 F.3d 928

7    (9th Cir. 2002).  The Court need not address both the deficiency prong and the prejudice prong

8    if the defendant fails to make a sufficient showing of either one.  *Strickland*, 466 U.S. at 697.

9        Here, Arviso's claim fails because he has not shown prejudice.  It is not disputed that

10   neither counsel was to refer to the contents of the cigarette box as anything other than

11   "contraband."  However, defense counsel's single misstatement was brief and immediately

12   corrected.  The jury was asked by defense counsel to disregard any reference to the contents of

13   the box "other than contraband."  (Rep. Tr. at 00687.)  The trial court reinforced that request by

14   instructing the jurors not to give defense counsel's misstatement any "weight or regard

15   whatsoever."  (*Id.* at 00688.)  The impact of counsel's inadvertent statement was also mitigated

16   by the fact that the jury was instructed that statements by counsel were not evidence.  (Clerk's

17   Tr. at 00280.)  A jury is presumed to follow the trial court's instructions.  *See Francis v.

18   Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the

19   gravity of their task, make sense of, and follow the instructions given them."); *see also Weeks

20   v. Angelone,* 528 U.S. 225, 234 (2000).

21        As the state court concluded, there was strong evidence of Arviso's guilt.  Detective

22   Cavaszos overheard Arviso say that he was going to Ensenada because it was "hot" in the area

23   and the police had put out a reward for him.  Arviso also said he had gotten into an argument

24   with a guy and shot him because he threatened him with a machete.  (Rep. Tr. at 00398, 00401-

25   05.)  Similarly, Velasquez overheard Arviso telling some friends that he was in trouble because

26   a guy had come at him with a knife and he (Arviso) had shot him.  (Rep. Tr. at 00228.)  Given

27   the weight of the evidence against Arviso, the state court reasonably concluded that he had not

28

1  demonstrated a reasonable probability that the result of the proceeding would have been different

2  absent counsel's inadvertent misstatement.  *Strickland*, 466 U.S. at 694.

3        Accordingly, the state court's denial of this claim was neither contrary to, nor an

4  unreasonable application of clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*, 429

5  U.S. at 412-13.  Arviso is not entitled to relief as to this claim.

6  **V.      CONCLUSION**

7        Having carefully considered Arviso's Petition, Respondent's Answer and Memorandum

8  of Points and Authorities in Support of the Answer, Arviso's Traverse, and all the documents

9  and legal authorities submitted by the parties, for all the foregoing reasons the Court **DENIES**

10  the Petition.  The Clerk of Court is directed to enter a judgment denying the petition with

11  prejudice.

12        **IT IS SO ORDERED.**

13  **DATED:**   June 25, 2009

14

15  **MARILYN L. HUFF, District Judge**
   **UNITED STATES DISTRICT COURT**

16

17

18

19

20

21

22

23

24

25

26

27

28